UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MIGUEL SEGUINOT,

                Plaintiff,                6:10-CV-1387

vs.


POLICE OFFICER SABANOVIC DZENAN[1]
 & UTICA POLICE DEPARTMENT & CITY
OF UTICA
                Defendants.
_____

**APPEARANCES:**                            **OF COUNSEL:**

MIGUEL SEGUINOT
Plaintiff, *Pro Se*

LAW DEPARTMENT                      John P. Orilio, Esq.
OFFICE OF THE CORPORATION COUNSEL    Asst. Corporation Counsel
1 Kennedy Plaza
Utica, New York   13502

**Hon. Norman A. Mordue, U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

       The present case arises from plaintiff's arrest on August 13, 2008, in the City of Utica, New York.  Plaintiff sues under 42 U.S.C. § 1983 arguing that the defendant police officer used excessive force in executing his arrest in violation of the Fourth Amendment to the United States Constitution.  Plaintiff's amended complaint also asserts a Fourth Amendment claim for municipal liability on the part of the City of Utica presumably based on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Finally, plaintiff alleges in vague terms with no factual averments violations violations of his Fifth, Sixth and Eighth and Fourteenth Amendments by defendants.

---

[1] Defendant Officer Dzenan Sabanovic is misnamed by plaintiff in the complaint as Sabanovic Dzenan.

Defendants move for summary judgment dismissing the complaint.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

According to defendants[2] the relevant facts occurred as follows: On August 23, 2008, at approximately 9:00 p.m., plaintiff was driving east on South Street in the City of Utica, New York.  He was talking on his cell phone and turned left onto Mohawk Street.  Defendants contend that when he made the left-hand turn onto Mohawk Street, plaintiff passed through a red light.  Based on his violation of two traffic laws, defendant Sabanovic, a City of Utica Police Officer, executed a traffic stop and pulled plaintiff's vehicle over.  Defendants assert that Sabanovic then exited his vehicle.  Plaintiff identified himself to Sabanovic as "Miguel Seguinot" and provided Sabanovic with a New York State driver's license.  Sabanovic returned to his vehicle to run a driver's check on plaintiff's license.

Defendants assert that while Sabanovic was running the driver's check, plaintiff got out of his vehicle and started walking toward Sabanovic's patrol vehicle.  Sabanovic immediately advised plaintiff to return to his vehicle.  Defendants assert that plaintiff refused to do so and said Sabanovic had to turn off his spotlight because it was bothering him.  The second time Sabanovic asked plaintiff to return to his vehicle, he complied.  Upon returning to his patrol car and completing the driver's check, Sabanovic learned that plaintiff had a suspended license.  He then returned to plaintiff's vehicle and advised him to step outside his vehicle.  Once he had exited his vehicle, Sabanovic told plaintiff that due to his license being suspended, he would have to come to the police station and be issued several tickets.  Upon hearing this, defendants assert that plaintiff became upset and stated "Why can't you just give me the fucking tickets here?"  Due to

---

[2] The Court notes that there is no evidence from Officer Sabanovic in proper evidentiary form.  To wit, his police report is not sworn to under penalty of perjury and he did not submit an affidavit attesting to the truth of the matters set forth in his report.

his behavior, Sabanovic contact police headquarters and requested the assistant of another patrol vehicle to respond and assist him.  Sabanovic asked plaintiff a second time to turn around and place his hands behind his back and that he was under arrest for driving with a suspended license. Plaintiff complied and Sabanovic took his handcuffs and put them in his right hand.  He had his left hand on plaintiff's back.

As he placed one handcuff on plaintiff's right wrist, defendants' assert plaintiff pushed off against the vehicle causing Sabanovic unwanted contact.  Plaintiff broke away from the officer and started "clinching his fists and raising them up in the air as if he was going to fight" Sabanovic.  Sabanovic advised plaintiff that he was going to be pepper sprayed if he did not comply.  Defendants assert that plaintiff replied "Fuck you mother fucker I will fucking kill you." Following this remark, Sabanovic started walking toward plaintiff and administered one one-second burst of pepper spray.  As he did so, the wind blew some of the pepper spray into Sabanovic's face.  After being pepper sprayed, plaintiff started running east on Rutger Street. Sabanovic advised police headquarters that he was involved in a foot chase.  As he ran after plaintiff, Sabanovic ran into the pepper spray that was still in the air.  As Sabanovic pursued plaintiff in the back parking lot of the Matt funeral Home, plaintiff tripped and fell on his chest and face.  He immediately got back up and continued running.  Plaintiff ran through the backyard of the residence at 708 Rutger Street, attempted to jump the fence and was unsuccessful.

At this point, Sabanovic was able to grab plaintiff and take him to the ground.  Plaintiff landed on his chest and face in the driveway of 708 Rutger Street and Sabanovic landed on top of him. When plaintiff attempted to get up, Sabanovic pressed on his back with his knee to prevent him from getting up.  Defendants assert that Sabanovic was in pain from the pepper spray and his vision was impaired and thus felt it was necessary to subdue plaintiff until back up arrived.  Each

time plaintiff attempted to get up, defendants assert that Sabanovic prevented him from doing so. Sabanovic had not yet had an opportunity to check plaintiff for weapons so he pulled his hands out from underneath his body and handcuffed with some force because plaintiff resisted.

After he was handcuffed, a back up unit arrived and Sabanovic assisted plaintiff in sitting up. He observed swelling and lacerations under plaintiffs; left eye. Plaintiff was charged with use of a cell phone, passing a steady red light, failure to cover loose cargo, aggravated unlicensed operation of a vehicle, harassment and resisting arrest.

In reviewing plaintiff's deposition transcript, the Court concludes that plaintiff views the facts differently. In the first instance, there is nothing in the deposition transcript about plaintiff getting out of his car prior to being asked to do so by the officer. Plaintiff also testified that he was unaware that his license was suspended. Plaintiff testified that Sabanovic told him he was going to arrest him for having a suspended license and that he was going to have to be taken to the station. Plaintiff stated:

> Then he was going to - he put the handcuffs on me. And then I turned and stepped back and took out his mace. And then he went to mace me. And what happened was the mace once he - it hit him in the face. And when it hit the policeman in the face I ran because I was on parole. And when I ran he ran after me.
>
> And I went into a yard. And I - I was tired and I said it's okay. And that is when he threw me on the ground. And when he threw me on the ground that is when he kicked me in the rib. And that is when I lost all of my breath. And I hit the ground and he was kicking me. And I don't remember anything more after that.
>
> And then when I woke up I was at the precinct. And that is when the captain came and I said I wanted to go to the hospital. And when I went to the hospital I had two chipped teeth. And I had two - and I had two or three fractured ribs. And my eye was really swollen and red. And they held me there for a while and they took me to OCJ.

Plaintiff testified during his deposition that he had photographs of himself which proved that he had suffered the injuries and medical records as well. Defendants assert that they made

4

discovery demands for both the photographs and the medical records and did not receive them. The Court notes that the docket does not reflect that defendants sought Court intervention for plaintiff's failure to produce these documents by way of a motion to compel discovery or a motion to preclude or even a discovery conference with the assigned Magistrate Judge.

**III.    DISCUSSION**

A.    Summary Judgment Standard

Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of NewYork*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the

motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers." ' *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner*, 303 U.S. 519, 520 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." ' *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). This does not mean, however, that a pro se litigant is excused from following the procedural requirements of summary judgment. See id. (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)). Specifically, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

Plaintiff was properly served with defendants' motion papers and the required notification of the consequences of failure to respond to a summary judgment motion on April 30, 2012. Plaintiff did not oppose the present motion or request additional time to present papers in opposition. Rather, on December 13, 2012, plaintiff wrote to the Court and stated the following:

> I had a brief conversation with the secretary Sue at the federal building regarding the status of my case above, and she had informed me their [sic] was a notice sent out for summary judgment response. I had received a printout from her regarding the details of the case. I have a learning disability which entails reading and writing. The last thing that I recall was I was going to receive a letter. I did not understand that I would have to respond! This is the example to why I would

6

> need an attorney. I have a friend who has helped me with this paperwork. She is not a lawer. [sic]

Plaintiff does not mention having received notice of defendants' motion papers. Perhaps he was conflating the "printout" and "details of the case" with the defendants' motion papers. In any event, he does not deny receiving defendants' motion papers and more importantly, the Court's docket does not reflect that he has moved or changed his address where he was served with the motion papers as well as the notice of the consequences of failure to respond to a motion for summary judgment.

As a further matter, plaintiff did not actually request additional time to respond to defendants' motion in this correspondence submitted nearly eight months after being served with the motion papers. Indeed, it is unclear what relief, if any plaintiff is requesting in his correspondence. He simply informs the Court that he was unaware that a response was necessary. Insofar as plaintiff's self-serving and conclusory allegation that he has a reading disability, he has submitted no medical evidence in support of this claim and even if it is true, the Court concludes that plaintiff has an obligation to insure someone assists him with reading his legal mail. Thus, the Court does not find that plaintiff's *pro se status* or his alleged disability excuses his failure to have filed opposing papers in the present matter. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *LoSacco v. City of Middletown* 71 F.3d 88, 92 (2d Cir.1995) ( "*[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

B.  Substantive Legal Standard

Plaintiff bases his federal claims on 42 U.S.C. § 1983, which reads in part:

7

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State ..., subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action.

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, (1979). Plaintiff claims that defendant Dznenan violated his constitutional rights because he used excessive force in executing his arrest.

C.   Excessive Force

Defendants move to dismiss plaintiff's excessive use of force claim on the ground that any force used against plaintiff in executing his arrest was necessary and appropriate under 42 U.S.C. § 1983.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. . . . [T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396 (internal citations omitted). Courts must view excessive force claims under the long-established principle that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). "Not every push or shove, even if it

8

may later seem unnecessary in the peace of a judge's chambers" is actionable under the Fourth Amendment. *Johnson v. Glick,* 481 F.2d 1028, 1033 (1973) (overruled on other grounds, 490 U.S. 386 (1989). Analysis of reasonableness of force used "must embody . . . the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

It is apparent from only the most cursory review of the record that the Court cannot dismiss plaintiff's complaint presently. The most glaring problem is that defendant Sabanovic's version of the events that occurred on August 23, 2008, is not in evidentiary form since his police report is not sworn to under penalty of perjury and he did not submit a deposition or an affidavit in this matter. The Court cannot rely on defendants' 7.1 Statement which incorporates Sabanovic's report as dispositive of the events as they unfolded that evening. In contrast, the Court has the sworn testimony of plaintiff who asserts that while he did attempt to flee, evade capture and resist arrest, he then offered to surrender peacefully at which time he was thrown to the ground and kicked without justification. There are numerous material factual issues that are disputed in connection with this claim including the nature of plaintiff's actions when Officer Sabanovic attempted to place him under arrest, what level of force was necessary to restrain him and whether he was thrown to the ground or kicked without justification. These material questions are at the heart of whether defendant Sabanovic used excessive force in placing plaintiff under arrest. Crediting plaintiff's allegations as set forth in his deposition transcript, a reasonable jury could find that plaintiff has met his burden of establishing a Fourth Amendment violation. Thus, summary judgment is inappropriate on plaintiff's excessive force claim.

D.      Qualified Immunity

9

Defendants assert they are entitled, in the alternative, to summary judgment on the ground of qualified immunity. Indeed, the Supreme Court has long held that denying summary judgment any time a material issue of fact remains on an excessive force claim could undermine the goal of qualified immunity which is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, the Court reiterated its instruction concerning the appropriate time to consider a defense of qualified immunity:

> In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

533 U.S. 194, 200-01 (2001) (internal citations omitted). In rejecting the argument that the reasonableness standard for Fourth Amendment claims and qualified immunity is identical, the Supreme Court acknowledged there was some "surface appeal" to the contention that it would be "inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he 'reasonably' acted unreasonably." *Saucier*, 533 U.S. at 203 (citing *Anderson v. Creighton*, 483 U.S. 635, 643 (1987)). This "superficial similarity," however, is inapposite given the "justifications for applying the doctrine in an area where officers perform their duties with considerable uncertainty" as to whether their actions comport with the Fourth Amendment. *Id.* Because analysis of the defense of qualified immunity

10

is not "merely duplicative" of a court's determination of an excessive force claim, early and particularized resolution of the former is required. *Id.* at 203.

Thus, when presented with a claim of qualified immunity, a court must consider as an initial question whether "[t]aken in the light most favorable to the party asserting the injury," the facts "show the officer's conduct violated a constitutional right?" *Id.* at 201.[3]

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Id.* The Court has already determined, as set forth above, that assuming the truth of plaintiff's evidence and allegations, a jury could find in his favor on the question of excessive force. Consequently, the next step is to consider whether the law clearly established that defendants' conduct was unlawful under the circumstances of the present case.

While there is no doubt that the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness, the Supreme Court made clear in *Saucier*

---

[3] The Supreme Court deemed this initial inquiry critical to proper sequential analysis of a qualified immunity defense:

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

*Saucier,* 533 U.S. at 201.

11

that in the context of a qualified immunity inquiry, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized and hence more relevant sense." *Id.* (quoting *Anderson*, 483 U.S. at 640). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

As referenced above, excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness standard," because of the uncertainty and rapidity inherent in police work. *Graham*, 490 U.S. at 396. Indeed, *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim which include analysis of the crime at issue, the threat posed by a suspect and any attempt by the suspect to evade or resist arrest. *See id.* If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. *See id.*

On the other hand, "the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205.

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the

12

> officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* Thus, the distinction between reasonableness as applied to excessive force cases and reasonableness in the context of qualified immunity is that the former contemplates a mistaken factual belief while the latter considers a mistake as to the scope of the law. To wit:

> [O]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an **unreasonable, warrantless search,** *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

*Id.* at 206 (emphasis added).

In this case, because the versions of the events which unfolded on August 23, 2008, offered by plaintiff and defendants are so starkly in contrast, the Court does not possess the facts needed to resolve the objective legal question. Indeed, while defendants assert that plaintiff resisted arrest and threatened officer Sabanovic who feared for his physical safety while attempting to get physical control of plaintiff, the Court cannot accept these facts since defendant Sabanovic did not present them in admissible form. Moreover, even if he had, plaintiff does not deny fleeing from the officer but testified that he gave up the chase and attempted to surrender peacefully at which time he was thrown to the ground and kicked numerous times.

In short, this is not a case where the Court has the necessary facts to decide whether the amount of force used was objectively or legally reasonable because the initial inquiry of whether force was even necessary has not yet been answered. If the facts are as set forth by defendants it might be appropriate to find that the officers believed that the amount of force used was necessary and reasonable even if it violated Fourth Amendment principles. However, if plaintiff's version

13

of the facts is credited, it is hard to conceive of how any police officer could be found to have reasonably concluded it was necessary to throw plaintiff to the ground or kick him prior to placing him under arrest or attempting to handcuff him.

Based on the foregoing, The motion by defendants to dismiss plaintiff's excessive force claims on the ground of qualified immunity must be denied without prejudice.

D.     Failure to Train and Supervise

Plaintiff raises a second *Monell* type claim against the City of Utica and its Police Department for their alleged failure to train and supervise defendant Sabanovic based on his violation of plaintiff's constitutional rights.  However, plaintiff has merely claimed, but failed to submit evidence in support of his claim, that the municipal defendants were deficient in their obligation to train and supervise defendant Sabanovic.  Review of the complaint does not reveal the alleged municipal policy at the heart of plaintiff's *Monell* claim.  It is only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights that it is liable for the injury.  *See Monell*, 436 U.S. at 692.  Moreover, it is necessary that the policy or custom be made by one "whose edicts or acts may be said to fairly represent official policy." *Id.* at 694.  Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the unlawful action of which a plaintiff complains.  *See Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986).  Finally, to establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation.  *See Monell*, 436 U.S. at 692.  Consequently, plaintiff's failure to train and supervise claims must be dismissed.

E.     Remaining Claims

Plaintiff's amended complaint also asserts claims under the Fifth, Sixth, Eighth and

14

Fourteenth Amendments.  However, he does not assert any facts in support of these claims other than stating he was the victim of excessive force.  Reading the amended complaint and the record in the light most favorable to plaintiff, the Court cannot conceive of any due process violations under the Fifth Amendment that would have inured to plaintiff under circumstances presented herein.  In connection with his Sixth Amendment rights, plaintiff does not assert that he was denied counsel during the criminal proceedings which followed his arrest.  It appears he pled guilty to resisting arrest.  Again, the Court fails to comprehend how defendants' conduct as alleged herein violated plaintiff's Sixth Amendment Rights.  The Eighth Amendment concerns cruel and unusual punishment in a penal sense and would seem to have no application in this case.  Plaintiff's Fourteenth Amendment equal protection claim also appears to have to application to the facts of this case since he does not assert that he was treated differently than any other class of persons or that defendant Sabanovic acted with a discriminatory purpose.  Because these claims have no apparent connection to the facts of this case, the Court will dismiss them at this time.

## IV.    CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the motion by all defendants for summary judgment (Dkt. #28) dismissing  plaintiff's amended complaint is DENIED in part and GRANTED in part; and it is further

ORDERED that the motion by defendants dismissing plaintiff's excessive force claim is DENIED; and it is further

ORDERED that the alternative motion by defendants dismissing plaintiff's excessive force claim on the ground of qualified immunity is DENIED;

ORDERED that the motion by defendants dismissing plaintiff's Fourth Amendment

15

claim against the City of Utica is GRANTED; and it is further

ORDERED that the motion by defendants to dismiss plaintiff's remaining claims under the Fifth, Sixth, Eighth and Fourteenth Amendments is GRANTED.

IT IS SO ORDERED.

Dated: March 28, 2013
      Syracuse, New York

_____
Honorable Norman A. Mordue
U.S. District Judge